**NO. 23-1642**

*In The*

# United States Court Of Appeals
# For The Fourth Circuit

## MICHAEL A. BAILEY;
## CHRISTIE B. BAILEY,

*Plaintiffs – Appellants,*

v.

## CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. BWD652420,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

_____

## BRIEF OF APPELLANTS

_____

Wesley A. Collins
HARVELL & COLLINS
1107 Bridges Street
Morehead City, NC 28557
(252) 726-9050
input@harvellandcollins.com

*Counsel for Appellants*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _23-1642_          Caption: _Bailey et. al. v. Certain Interested Underwriters at Lloyd's London_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Michael A. Bailey_
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: 6-27-2023

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1642          Caption: Bailey et. al. v. Certain Interested Underwriters at Lloyd's London

Pursuant to FRAP 26.1 and Local Rule 26.1,

Christie B.  Bailey
(name of party/amicus)


who is          Appellant          , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: 6-27-2023

Counsel for: Appellants_____

- 2 -

Print to PDF for Filing

# <u>TABLE OF CONTENTS</u>

**Page**

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES........................................................................ iii

STATEMENT OF JURISDICTION ..............................................................1

ISSUES PRESENTED FOR REVIEW ..........................................................1

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE......................................................................2

I.      FACTUAL BACKGROUND ...........................................................2

        A.      Summary of Facts...............................................................2

        B.      General Basis of the Claims ................................................4

II.     PROCEDURAL HISTORY..............................................................6

SUMMARY OF THE ARGUMENT .............................................................7

STANDARD OF REVIEW ..........................................................................8

ARGUMENT ..............................................................................................9

I.      LEGAL STANDARD ......................................................................9

        A.      Statutory Bad Faith (N.C. Gen. Stat. 58-63-15(11)) and
                Covenant of Good Faith and Fair Dealing ...........................9

        B.      Unfair and Deceptive Trade Practices (N.C. Gen. Stat. 75-1.1) .........12

II.     ANALYSIS ...................................................................................13

        A.      *Browder v. State Farm Fire & Cas. Co.*..............................18

i

B.   *Hunter v. State Farm Fire & Cas. Co.* ................................................22

C.   *Gandecha v. Metro. Prop. & Cas. Ins. Co.* ..........................................26

CONCLUSION .........................................................................................30

CERTIFICATE OF COMPLIANCE ........................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .............................9

*Bicycle Transit Authority, Inc. v. Bell*,
  314 N.C. 219 (1985) ..............................................................................9

*Browder v. State Farm Fire & Cas. Co.*,
  2020 U.S. Dist. LEXIS 243021 (2020) ........................................8, 18, 19, 20

*Elliott v. Am. States Ins. Co.*,
  883 F.3d 384 (4th Cir. 2018) .......................................................................12

*Gandecha v. Metro. Prop. & Cas. Ins. Co.*,
  2014 U.S. Dist. LEXIS 118823 (2014) ..................................................26, 27

*Gray v. N.C. Ins. Underwriting Ass'n*,
  352 N.C. 61, 529 S.E.2d 676 (2000) ...........................................................13

*Hunter v. State Farm Fire & Cas. Co.*,
  DOCKET NO. 5:17-cv-00224-FDW-DSC,
  U.S. Dist. LEXIS 127032 (W.D.N.C. Jul. 30, 2018) ........................22, 23, 25

*Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co.*,
  359 F. Supp. 3d 306 (2019) .........................................................................10

*Robinson v. North Carolina Farm Bureau Ins. Co.*,
  86 N.C. App. 44 (1987) ..................................................................9, 11, 12

*Rose Hill United Methodist Church v. Church Mut. Ins. Co.*,
  2022 U.S. Dist. LEXIS 123369 (E.D.N.C. Jul. 12, 2022).............9, 10, 11, 13

*Vieira☐ v. Anderson* (*In re Beach First Nat'l Bancshares, Inc.*),
  702 F.3d 772 (4th Cir. 2012) .........................................................................8

*Walker v. Fleetwood Homes*,
  362 N.C. 63 (N.C. 2007) ..............................................................................13

**Statutes**

28 U.S.C. § 1291 ...................................................................1

28 U.S.C. § 1332 ...................................................................1

N.C. Gen. Stat. § 58-54.4..........................................................9

N.C. Gen. Stat. § 58-63-15 .....................................................23, 29

N.C. Gen. Stat. § 58-63-15(11)...............................................*passim*

N.C. Gen. Stat. § 75-1.1 .......................................................*passim*

**Rules**

Fed. R. Civ. P. 12 ...............................................................20, 21

Fed. R. Civ. P. 12(b)(6)........................................................8, 9

**Other**

*Browder* Amended Complaint,
Case 1:20-cv-00026-MOC-WCM, DE No. 3 (04/10/20)
    https://ecf.ncwd.uscourts.gov/doc1/13504086268
    last visited October 6, 2023 .......................................................20

*Hunter* Amended Complaint,
Case 5:17-cv-00224-FDW-DSC, DE No.13 (03/02/18)
    https://ecf.ncwd.uscourts.gov/doc1/13503481520
    last visited October 6, 2023 .......................................................25

*Gandecha* Complaint,
Case 5:13-cv-00688-F, DE No. 1 (10/01/13)
    https://ecf.nced.uscourts.gov/doc1/13103546849
    last visited October 6, 2023 .......................................................30

## STATEMENT OF JURISDICTION

This case was initiated by Michael A. Bailey and Christie B. Bailey (hereinafter collectively referred to as "Plaintiffs") on August 22, 2022, against Certain Interested Underwriters at Lloyd's London Subscribing to Policy No. BWD652420 (hereinafter referred to as "Defendant"). Plaintiffs are citizens and residents of Virginia. Defendant is composed of syndicates whose subscribers are organized in a foreign country. The district court had jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeded $75,000.00 and the dispute was between citizens of Virginia and a foreign country. This appeal is from the final order of the district court entered on May 17, 2023, dismissing Plaintiff's Amended Complaint with Prejudice. Notice of appeal was timely filed on December 6, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Did the trial court err in granting Defendant's 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint with prejudice?

## INTRODUCTION

Plaintiffs own beachfront real property, located at 211 Salter Path, Carteret County, North Carolina (hereinafter referred to as the "Property"), which they rent out to vacationers. In 2018, Hurricane Florence swept through the North Carolina coastline, causing extensive damage to Plaintiffs' home. After timely notifying

Defendant, Defendant sent an adjuster to inspect the damage. However, the adjuster only completed a surface level inspection. After performing the cursory inspection, Defendant advised that Plaintiffs perform simple repairs that were mostly aesthetic in purpose. However, after noticing new water damage during a subsequent storm, Plaintiffs hired an engineer to perform an invasive inspection, revealing severe structural damage, requiring costly structural repairs. Plaintiffs informed Defendant of the engineer report, but Defendant refused to acknowledge the report and denied a majority of their claim. After reaching a dead end with Defendant, Plaintiffs instigated this action. After years of litigation, Defendant finally paid the full claim, but only after engaging in certain bad faith settlement practices and delaying the claim settlement by several years. Defendant then filed a motion to dismiss all claims, which was granted by the trial court judge. Subsequently, Plaintiffs initiated this appeal.

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

### A.     Summary of Facts

In August of 2018, Plaintiffs purchased the Property. JA292. Plaintiffs obtained a homeowners insurance policy through Defendant. JA293. On September 13, 2018, Hurricane Florence produced high sustained wind conditions along with

wind gusts over 100 miles per hour and heavy rains which persisted for many days. JA294. Hurricane Florence caused substantial damage to the Property. JA294.

The insurance policy held by the Plaintiffs through Defendant was in effect at the time Hurricane Florence damaged the Property. JA294. On September 18, 2018, Plaintiffs discovered that the Property suffered significant and visible storm damage. JA295. Plaintiffs immediately notified Defendant to report the damage to their Property and to start mitigation efforts. JA295. On October 5, 2018, Plaintiffs met with Defendant's field adjuster at the Property and Defendant's field adjuster conducted a visual inspection of the Property. JA295-296. Subsequently, Defendant's field adjuster instructed Plaintiffs to make various repairs to the Property. JA296. Plaintiffs conducted the repairs in order to mitigate the damage to the Property in compliance with the Policy. JA296.

Shortly after Plaintiffs made repairs to the Property, Plaintiffs noticed that the Property continued to have significant water intrusion. JA297. Plaintiffs then hired their own adjuster and engineer to conduct an invasive investigation of the Property. JA297. The investigation revealed more severe damage than what Defendant's adjuster had reported. JA297-298. Plaintiffs would need to remove the repairs they made based on Defendant's adjuster recommendations and would need to conduct additional repairs to the Property to make the residence habitable. JA296.

3

To conduct these additional repairs, Plaintiffs sought to recover insurance payments from Defendant under three areas of the Policy: Coverage A- Dwelling, Coverage C- Personal Property, and Coverage D- Loss of Use/Rents. JA295, JA298-300. Defendant did not dispute the amount of loss covered under Coverage C- Personal Property and Coverage D- Loss of Use/Rents. JA295, JA298-300. Plaintiff and Defendant were not able to reach an agreement for the amount of loss under Coverage A. JA299. Eventually, Defendant and Plaintiff agreed to participate in the appraisal process to determine the amount of loss covered under Coverage A. JA301. For three years prior to appraisal, Plaintiffs were unable to rent their property and had to conduct extensive repairs to make the Property habitable. JA301. The Appraisal panel determined a total loss amount, factoring all three coverage provisions. JA301.

### B.    General Basis of the Claims

The gravamen of the Plaintiffs' Amended Complaint (hereinafter referred to as "Amended Complaint") is that Defendant first attempted to quickly resolve the insurance claim by having their field adjuster report to Plaintiffs that the damage was minimal and could be resolved with relatively inexpensive cosmetic repairs and select window replacement. Plaintiffs reasonably relied upon the advice of the field adjuster, making the mostly cosmetic repairs. After learning that these minimal repairs were grossly inadequate and learning specifically that the residence sustained

serious structural racking and extensive water intrusion within the walls and other cavities, Defendants continued to purposefully forestall and delay the adjustment of the claim as described in the Amended Complaint. During this unreasonable and purposeful delay, the claim remained unresolved, and Plaintiffs were without the necessary insurance funds to repair the damage. Thus, the residence remained uninhabitable during a period of over three years. Plaintiffs lost hundreds of thousands of dollars in lost rent due to this unreasonable and intentional delay. These damages were a direct result of the Defendant's improper handling of the claim.

Furthermore, the insurance proceeds received (approximately $170,000.00) for the initial recommended cosmetic repair were almost entirely lost as Plaintiffs were required to remove all initial work when the walls were removed to conduct the proper and complete repair. These damages were a direct result of Defendant's improper handling of the claim.

Eventually, the umpire awarded Plaintiffs $1,022,114.00. This amount is over $750,000.00 more than Defendant offered pursuant to its initial flawed investigation. Defendant eventually paid the full amount awarded by the umpire, but not before engaging in the various bad faith practices described herein.

If Defendants had properly adjusted the claim, and acted in good faith, Plaintiffs would not have suffered the extensive lost rents and would not have wasted the approximately $170,000.00 initially received. These are damages sustained

beyond the limits of the policy because they were caused not by Hurricane Florence, but by the actions of Defendant. Plaintiffs have alleged that in addition to the lost rent and money wasted on the ill-advised repairs, they are likewise entitled to extra-contractual damages due to the intentional actions of Defendant.

## II.      PROCEDURAL HISTORY

On August 22, 2022, Plaintiff's filed their amended complaint in the Carteret County Superior Court for the State of North Carolina seeking to recover damages from Defendant under the theories of Breach of Contract, Negligence, Bad Faith Settlement Practices, actionable by N.C. Gen. Stat. § 75-1.1, and Unfair and Deceptive Trade Practices. JA291-312. Defendant removed this action to the United States District Court for the Eastern District of North Carolina on October 22, 2021. On September 6, 2022, Defendant filed their Motion to Dismiss Plaintiffs' Amended Complaint. On May 17, 2023, the District Court Trial Judge ruled in favor of Defendants, dismissing Plaintiffs' Amended Complaint with prejudice. JA677-694. On May 26, 2023, Plaintiffs filed their notice of appeal, appealing the Trial Judge's order granting Defendant's 12(b)(6) motion to dismiss. JA696. For the purposes of this appeal, Plaintiffs will focus on their Second Claim for Relief for Statutory Bad Faith and their Third Claim for Relief for Violation of N.C.G.S. § 75-1.1.

## SUMMARY OF THE ARGUMENT

The heart of Plaintiffs' argument is simple; prior cases, decided by Fourth Circuit District Courts call for the reversal of the Trial Court's order. There are a multitude of cases with similar allegations as those at hand, which survived 12(b)(6) motions. The common theme between these cases is that it is nearly impossible for plaintiffs to make specific allegations of unfair claims settlement practices before they are granted the opportunity to perform discovery. Claims such as those alleged in this case inherently involve elements of secrecy and deception on the part of Defendants and can never be fully fleshed out at the 12(b)(6) stage.

The Trial Court also failed to recognize key allegations in making its decision. The Trial Court dismissed Plaintiff's claims for Statutory Bad Faith and UDTPA because Defendant's acts of performing an insufficient inspection do not amount to bad faith. However, the Trial Court fails to acknowledge Plaintiffs' allegations that Defendants intentionally ignored the recommendation from the North Carolina Department of Insurance to perform more invasive inspections of beach properties and that Defendant intentionally ignored Plaintiffs' expert opinions. The trial Judge states that "the Baileys do not plausibly allege that the adjuster's visual inspection was unreasonable and failed to take into consideration the opinion of Bailey's engineer." JA689. The trial Judge then points out that Defendants hired their own engineers and based their denial on their opinions.

JA689. However, the trial Judges opinion is a complete distinction from the precedent laid out below.

The Trial Court was selective in its consideration of certain precedent, while ignoring others. The Trial Court was even selective of the particular sections within the precedent that it considered. For example, the trial Judge ruled that *Browder v. State Farm Fire & Cas. Co.* is distinguishable from the present matter solely because in *Browder,* the defendant did not consider the expert opinion that they asked the plaintiff to provide, whereas in the present case, Defendant did not consider the expert opinion that Plaintiffs provided on their own volition. JA690. The only distinction found by the trial Judge is that the Defendant in this case did not ask for the expert opinion that they ignored. As further described below, the complaint in *Browder* is substantially similar to the Amended Complaint. Plaintiffs concede that Defendant did not request the expert opinion. However, that does not change the fact that Defendant had access to opinions that contradicted with their own experts, but Defendant failed to acknowledge Plaintiffs' expert and failed to provide any explanation for their refusal to acknowledge plaintiffs Expert.

On top of *Browder,* there are many cases that establish precedent, seen below.

## STANDARD OF REVIEW

The standard of review on appeal of a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss is *De Novo. Vieira v. Anderson* (*In re Beach First Nat'l Bancshares*), 702

F.3d 772, 776. When reviewing a Fed. R. Civ. P. 12(b)(6) dismissal, the factual allegations in the complaint are accepted as true. *Id.* "Twombly 's plausibility standard requires that a plaintiff's well-pleaded factual allegations 'be enough to raise a right to relief above the speculative level.'" *Rose Hill United Methodist Church v. Church Mut. Ins. Co.,* 2022 U.S. Dist. LEXIS 123369 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). When making this determination, all reasonable inferences from the well-pleaded factual allegations must be drawn in the non-movant's favor. *Id.*

## ARGUMENT

### I.   LEGAL STANDARD

#### A.   Statutory Bad Faith (N.C. Gen. Stat. 58-63-15(11)) and Covenant of Good Faith and Fair Dealing.

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 228 (1985). "An insurance company is expected to deal fairly and in good faith with its policy holders. The North Carolina General Assembly has acknowledged that principle by its adoption of N.C.G.S. § 58-54.4." *Robinson v. North Carolina Farm Bureau Ins. Co*., 86 N.C. App. 44, 50 (1987). "North Carolina law recognizes 'a separate claim for breach of an implied covenant of good faith and fair dealing [from a Breach of Contract Claim] only in limited circumstances involving special

relationships between parties, [such as] cases involving contracts for funeral services and insurance.'" *Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co.*, 359 F. Supp. 3d 306, 313-314 (2019).

"To state a claim for an insurer's bad-faith refusal to settle, the plaintiff must plausibly allege an insurer's (1) refusal to pay after recognition of a valid claim and (2) bad faith." *Rose Hill United Methodist Church v. Church Mut. Ins. Co.*, 2022 U.S. Dist. LEXIS 123369 (2019). In defining the factors of bad faith, N.C. Gen. Stat. § 58-63-15(11) provides, in pertinent part:

> Committing or performing with such frequency as to indicate a general business practice of any of the following: Provided, however, that no violation of this subsection shall of itself create any cause of action in favor of any person other than the Commissioner:
>
> a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
>
> b. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
>
> c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> d. Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> e. Failing to affirm or deny coverage of claims within a reasonable time after proof-of-loss statements have been completed;
>
> f. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

10

g. Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured;

h. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled;

…

N.C. Gen. Stat. § 58-63-15(11).

"Insurers can be held liable for tortious bad-faith refusal to settle if they baselessly withhold payment and force the insured through the time and expense of that process." *Rose Hill United Methodist Church*, 2022 U.S. Dist. LEXIS 123369 at \*24 (E.D.N.C. July 11, 2022). "The Middle District of North Carolina held in *Guessford* that an insurer's allegedly 'willful failure to investigate [the insured's] claim and provide any reasonable settlement offer' satisfied [the bad faith element] given the information the plaintiff had provided." *Id.* at 27-28.  "As to the third element, '[a]ggravated conduct includes fraud, malice, gross negligence, [and] insult as well as actions denying coverage willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiffs rights.'" *Id.* at 29.

Eventual compliance with policy provisions does not insulate an insurer from all potential liability for its claims-handling process. See *Robinson v. N. Carolina Farm Bureau Ins. Co.*, 86 N.C. App. 44, 49-50, 356 S.E.2d 392, 395 (1987) (agreeing that an insurer "is not absolved from punitive damages because it later

performed as it should"). While the North Carolina Court of Appeals noted that "most" cases will involve an insurer's refusal to pay, *Robinson* rejected the argument that other claims "cannot exist where coverage is not denied, settlement is not refused, and the policy limits are timely paid." *See Id* ("We find nothing in the case law which requires that the tortious conduct be accompanied by a breach of the contract [.]").

"[W]hen there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort may itself give rise to a claim for punitive damages[ ] . . . [e]ven when sufficient facts are alleged to make out an identifiable tort, however, the tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed." *Id* at 49. "We do not believe an action for punitive damages from tortious conduct is precluded when the company eventually pays, if bad faith delay and aggravating conduct is present." *Id* at 50.

The remedy or a violation of N.C. Gen. Stat. § 58-63-15(11) is the filing of an Unfair and Deceptive Trade Practices claim under section 75-1.1. *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 396.

### B.    Unfair and Deceptive Trade Practices (N.C. Gen. Stat. 75-1.1)

"To establish an UDTPA violation, the plaintiff must show (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately

caused injury to plaintiffs." *Rose Hill United Methodist Church*, 2022 U.S. Dist. LEXIS 123369 at *31-32. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72. "A practice is deceptive where it has the tendency or capacity to deceive." *Id.* The North Carolina Supreme Court has held that when an insurance company engages in a practice or act constituting an unfair claim settlement practice under N.C. Gen. Stat. § 58-63-15(11), it "also engages in conduct that embodies the broader standards of N.C. Gen. Stat. § 75-1.1 because such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers." *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 71, 529 S.E.2d 676, 683 (2000).

## II.    ANALYSIS

In respectful contradiction to the trial Judge's opinion, Plaintiffs contend that the allegations pleaded in the Amended Complaint are sufficient to withstand a 12(b)(6) motion, as evidenced by a multitude of cases decided by Fourth Circuit Federal Courts. N.C. Gen. Stat. 58-63-15(11) provides no remedy in and of itself and is only actionable via N.C. Gen. Stat. 75-1.1. Additionally, violations of N.C. Gen. Stat. 58-63-15(11) are inherently violations of N.C. Gen. Stat. 75-1.1. Therefore, the allegations within the Amended Complaint pertaining to 58-63-15(11) and 75-1.1 will be discussed simultaneously.

The relevant paragraphs of the Amended Complaint are enumerated below:

27.     Upon information and belief, during the October 5, 2018, meeting, the Defendant's field adjuster conducted a visual inspection of the Property only and did not attempt to identify any moisture damage within the walls of the Property;

28.     Defendant's field adjuster specifically instructed Plaintiffs that they did not need to investigate for any interior moisture damage within the walls, that the water intrusion was limited to several windows, and that the mitigation work could be accomplished by replacing the windows, painting the interior, and replacing cabinetry, electrical and plumbing fixtures;

29.     Upon information and belief, as to performing the adjustment and recommending the mitigation and restoration of the Property, Defendant's adjuster's loyalty was divided between Plaintiffs and Defendant because Defendant's adjuster had worked with Defendant on other occasions and because Defendant was responsible to tender payments for the restoration and exercised considerable control as to the cost of the restoration project;

30.     Upon information and belief, unbeknownst to Plaintiffs, at the time the adjustment occurred, North Carolina's Department of Insurance had issued a statement to insurance carriers, including Defendant, notifying them of the need to do more invasive inspections based upon the use of moisture vapor barriers on the coast;

44.     Despite the loss being a covered loss under the policy, and despite the Defendant's obligation to promptly investigate, adjust, and pay the loss, Defendant went to great measures to delay its obligations to Plaintiffs.  This includes but is not limited [to] Defendant's failure to adequately assess and assist in the repair of the damage, affirmatively representing to Plaintiffs that the scope of damage was far less than it actually was while later attempting to deny coverage for the damage to the residence premises, for Compelling Plaintiffs to commence litigation to recover amounts due under an insurance policy by offering substantially less than the loss amount, and in other ways that will proven through discovery and at the trial of this action;

51.     Field adjuster Carroll, acting as an agent of Defendant, directed Plaintiffs that Plaintiffs were to remediate the interior of the dwelling by sanding, staining, and repainting and/or finishing the interior walls.  Based upon these representations, Plaintiffs undertook

14

these remedial measures, spent approximately $80,000.00 in doing so, and attempted to rent their home;

57.     Prior to appraisal, Defendant voluntarily remitted a mere $68,400.00 for this loss in rental income— which was a fraction of what was owed under the loss.  This was a pattern of conduct by Defendant in this loss;

59.     On June 7, 2021, Defendant issued Plaintiffs a non-renewal notice.  Upon information and belief, the non-renewal of Plaintiffs' policy was based upon Plaintiffs having suffered a loss and making a claim under the policy;

71.     Upon information and belief, the initial adjuster, a representative of Lloyd's based his scope of the initial adjustment on visuals alone, which is a wholly inadequate adjustment. In addition, Defendant Lloyds told Plaintiffs that further invasive investigation and mitigation would be unnecessary and that the minimal repairs recommended by Defendant Lloyds through its agent was sufficient to bring the home to its pre-loss condition;

72.     Upon information and belief, the initial adjuster was acting at the direction and as agent for Lloyd's; in doing so, this adjuster purposely undervalued the loss, as a more invasive adjustment would have revealed the scope of damage;

74.     Defendant Lloyd's did not promptly conduct a thorough investigation for the full claim amounts;

75.     Defendant Lloyds' initial representation of loss amount and payment totaled $166,591.89; the total amount of the appraisal award, however, was $1,002,114.00—over 90% more than Defendant Lloyds' payment after its initial investigation of the loss;

76.     Plaintiffs repeatedly put Defendant Lloyd's on notice of the damages amount and requested full payment of their claim pursuant to their policy;

79.     The Defendant Lloyds' conduct, actions, omissions, and refusals to timely and promptly adjust and pay the Claim constitutes bad faith in one or more of the following particulars:

a.     The Defendant Lloyds breached the covenant of good faith and fair dealing;

b.     The Defendant Lloyds demonstrated a willful, oppressive forestalling of payment in order to bring financial pressure to bear upon Plaintiffs for Defendant's own advantage and financial gain;

c.   The Defendant Lloyds misused its power and authority in such a way as to be tantamount to outrageous conduct;

d.   The Defendant Lloyds recklessly and wantonly disregarded Plaintiffs' rights as insureds under the Policy;

e.   The Defendant Lloyds misrepresented pertinent facts or insurance policy provisions related to the coverages at issue;

f.   The Defendant Lloyds failed in good faith to effectuate prompt, fair, and equitable settlement of the Claim after liability had become reasonably clear;

g.   The Defendant Lloyds withheld payment for the Plaintiffs' loss without a valid basis under the provisions of the Policy;

h.   The Defendant Lloyds acted in the manner outlined in Plaintiffs' Second Claim for Relief;

i.   The Defendant Lloyds retaliatorily non-renewed Plaintiffs' policy because Plaintiffs' suffered a loss and made a claim under the policy; and

j.   The Defendant Lloyds otherwise acted in bad faith as shall be shown through discovery and proven at the trial of this action;

80.   Defendant Lloyds' conduct constitute multiple violations of § 58-63-15 (11) and 75-1.1…;

81.   Defendant Lloyds unfair and deceptive acts and practices as described above, including but not limited to misrepresenting material facts relating to the coverage at issue and the extent of damage to Plaintiffs property, failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, and solely relying on information provided by their engineer and not equally considering the data provided by Plaintiff, constitute unfair or deceptive acts or practices…;

82.   The unfair and deceptive acts and practices of Defendant Lloyds as described above and of failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claims, even though Defendant Lloyds' liability under the Policies was reasonably clear, constitute unfair and deceptive acts or practices…;

83.   Defendant Lloyds' unfair and deceptive acts and practices as described above, of failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claims, even though

Defendant Lloyds' liability under the Policies were reasonably clear, constitute unfair and deceptive acts or practices…;

84.     Defendant Lloyds' unfair and deceptive acts and practices as described above, of attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled and compelling the Plaintiffs to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the Plaintiffs, constitute unfair and deceptive acts or practices…;

85.     Defendant Lloyds' unfair settlement practices, as described above, of refusing to pay Plaintiffs' claim without conducting a reasonable investigation constitute unfair and deceptive acts or practices…;

86.     Defendant Lloyds' unfair and deceptive acts and omissions show reckless indifference to Plaintiffs' rights, oppression, insult, rudeness, caprice, and willfulness. Defendant's acts and omissions amount to a reckless, careless, and conscious disregard for the rights of Plaintiffs; thus supporting recovery of punitive damages. The same constitutes Common Law Bad Faith;

90.     Defendant Lloyds' conduct violated the Unfair and Deceptive Trade Practices Act…by engaging in false, misleading, or deceptive acts and practices such as excessive delay tactics, disregarding Plaintiff's expert's opinions, and refusing to pay under a covered claim;

93.     Plaintiffs were consumers in that Plaintiffs purchased the policies and insurance contracts which form the basis of this action. Defendant Lloyds' conduct constitutes unfair or deceptive acts or practices in the following ways;

>    a.     Defendant Lloyds' misrepresented to the claimant-insured a material fact or policy provision relating to coverage at issue including, but not limited to engaging and relying upon engineers who inaccurately determined there was no racking to the insured premises when the evidence was to the contrary;

>    b.     Defendant Lloyds' failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim with respect to which the insurer's liability became reasonably clear;

c.    Defendant Lloyds' refused to pay the claim without a reasonable investigation on its part with respect to the claim;

95.    Defendant Lloyds placed its own interest ahead of its insureds' by affirmatively representing to Plaintiffs that the extent of damage was less than Defendant Lloyds knew it to be, thus minimizing the amount of money Defendant Lloyds' would have to pay on the claim; and

96.    Defendant Lloyds' conduct was unfair, deceptive, oppressive, rude, aggravated, intentional, an over-reaching exercise of unequal bargaining power or discretion, and fraudulent.

JA296-297, JA299-300, JA303-3034, JA306-309.

As explained further herein, these allegations are sufficient to withstand a 12(b)(6) Motion to Dismiss. Lawsuits of this nature are common, therefore the best method of measuring the sufficiency of the allegations is to examine similar cases. Each of the below cases feature allegations substantially similar to those at bar, yet each of the below cases surpassed the 12(b)(6) standard, the first being *Browder.*

**A.    *Browder v. State Farm Fire & Cas. Co*.**

In *Browder,* Tropical Storm Alberto passed through Browder's property, causing extensive damage. *Browder v. State Farm Fire & Cas. Co*., 2020 U.S. Dist. LEXIS 243021, (2020). Browder's home insurance policy was in full force and effect. *Id.* Browder gave timely notice of the loss to their insurance carrier, State Farm Fire & Casualty Company, (hereinafter referred to as "State Farm"). *Id.* State Farm instructed Plaintiffs to have their property inspected. *Id* at 2. Subsequently, Browder retained the Warren Group Inc., who determined that high winds caused

18

the residence to shift, making it uninhabitable, and that there were no signs of shifting due to water erosion. *Id.* A second inspection company, Bunnell Lammons Engineering, was retained by Browder and made similar findings. *Id.* Reports from both inspection companies were provided to State Farm. *Id.* State Farm performed their own inspection of Browder's property through NFC Engineering Services of North Carolina and EAS Professionals, Inc. *Id.* at 3. Finally, State Farm denied Browder's claim on the basis that the loss was caused by soil erosion under the home, seemingly disregarding Browder's expert opinions entirely. *Id.*

Consequently, Browder initiated a legal action against State Farm, alleging among other claims, Bad Faith Refusal to Settle Claim, Unfair Claim Settlement Practices under N.C. Gen. Stat. § 58-63-15(11), Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1, and Punitive Damages. *Id* at 4. State Farm brought a motion for judgment on the pleadings, which is reviewed under largely similar standards (the key difference being that the court is to consider the answer as well as the complaint, but still treating the non-movants' averments as true). *Id* at 5. The Browder allegations pertinent to this matter are as follows:

> 14.     Defendant refused to consider the Warren Group's findings contrary to their own best practices of considering and relying upon the expert's opinion;
> 30.     Defendant refused to pay Plaintiffs' valid insurance claim after receipt of sufficient information from the Plaintiffs to allow Defendant to recognize the validity of the claim;
> 31.     Defendant's refusal to pay said claim was intentional and in bad faith;

19

32.    Upon information and belief, Defendant as a matter of course has denied claims that it was obligated to pay in full during the time period that it denied Plaintiffs' claims;

33.    By their conscious and intentional refusal to pay said claims in reckless or wanton disregard of Plaintiffs' rights, Defendant has engaged in aggravated and outrageous conduct;

36.    In carrying out the conduct described herein, Defendant has engaged in fraudulent, malicious, willful and wanton conduct which, upon information and belief, corporate managers participated in or condoned;

40.    Defendant has refused to pay claims without conducting a reasonable investigation based upon all available information;

41.    Defendant has failed to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

42.    Defendant has attempted to settle a claim for less than the amount to which a reasonable man would have believed he was entitled;

43.    Upon information and belief, Defendant has committed or performed the acts set forth above with such frequency as to indicate a general business practice;

47.    The acts and omissions of Defendant alleged herein were unfair, deceptive, unscrupulous, oppressive, immoral, and substantially injurious to Plaintiffs as consumers; and

49.    By virtue of committing an unfair claim settlement practice pursuant to N.C.G.S. § 58-63-15(11), in addition to the allegations herein, Defendant has engaged in unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1.

(Browder Complaint ¶¶ 5, 10-12, 14, 17, 18, 30-33, 36, 39-43, 47, 49).

*See* https://ecf.ncwd.uscourts.gov/doc1/13504086268

Ultimately, the Western District Court ruled in favor of Browder, denying State Farm's motion. *Browder v. State Farm Fire & Cas. Co.*, 2020 U.S. Dist. LEXIS 243021, (2020). In making their decision, the court found that since the motion was brought at the Rule 12 stage, "there has been little development of the

20

facts because there has been no discovery. Therefore, Plaintiffs do not yet have enough evidence to support factual allegations that meet the three elements of bad faith in the insurance context[.]" *Id* at 7. The court also placed heavy emphasis on State Farm's refusal to consider Browder's experts, as well as State Farm's failure to explain how Browder's expert reports were evaluated and why Browder's expert reports were seemingly rejected. *Id.* Finally, the court ruled that Browder's allegations that State Farm failed to consider Browder's expert opinions, violated their own best practices rule, and refused to conduct a reasonable investigation was sufficient to surpass a motion for judgment on the pleadings. *Id* at 13.

The Amended Complaint makes the same allegations as the Browder Complaint and even pleads many allegations with greater particularity. Like in the Browder Complaint, the Amended Complaint alleges that expert opinions, explaining that the loss was covered under the policy, were submitted to Defendant, however Defendant inexplicably ignored or rejected the expert opinions and only examined their own expert opinions. The Amended Complaint also alleges that Defendant violated their best practices rule by refusing to comply with the statement issued by the North Carolina Department of Insurance, providing that beach properties required more invasive inspections. The Amended Complaint alleges in paragraph 57 that Defendant's acts were a common pattern, similar to how the Browder Complaint alleges that State Farm's conduct was a matter of course.

21

Even more importantly, the Amended Complaint alleges many aspects of the claims in much greater detail than the Browder Complaint. Whereas the Browder Complaint simply makes allegations that meet the enumerated requirements of Unfair Settlement Practices and UDTPA claims, the Amended Complaint goes into great detail pertaining to: (1) the insufficient inspection performed by Defendant, (2) the specific representations made by Defendant, (3) Defendant's adjuster's divided loyalty, (4) Defendant's lack of regard for the statement issued by North Carolina's Department of Insurance, (5) Plaintiffs' expert opinions and Defendant's refusal to consider such opinions; (6) Defendant's retaliatory non-renewal; (7) Defendant's purposeful undervaluation of the loss; (8) Defendant's implementation of delay tactics; and (9) Defendant's acts of placing their own interest ahead of Plaintiffs.

Therefore, the specificity of the Amended Complaint exceeds the that of the Browder Complaint and should succeed on a test of the sufficiency of the pleadings.

### B.     *Hunter v. State Farm Fire & Cas. Co*.

In *Hunter v. State Farm Fire & Cas. Co.,* Hunter owned an insurance policy covering her house, which experienced extensive water and structural damage. *Hunter v. State Farm Fire & Cas. Co*., 2018 U.S. Dist. LEXIS 127032, *1 (2018). Hunter filed several claims, which were all denied by State Farm. *Id.* In assessing these claims, Defendant retained an engineering firm, Donan Engineering Co. Inc.,

who attributed the damage to improperly installed window trim, deteriorating window sealant leading to continuous leakage, and deterioration/rot. *Id* at 2. The Donan report further provided that the long-term intrusion of water had weakened the horizontal members between the living room windows and the basement window and door header, recommending that the wall be exposed to properly determine the extent of the structural damage. *Id.* Following this advice, Hunter hired a construction consultant who tore open the walls and reported that the structural members supporting the windows had failed and certain parts of those members had caved in, causing parts of the home to be uninhabitable. *Id* at 3. During the Donan inspection, the inspector informed Hunter that the door in the basement should not be opened in its existing condition because it can cause the wall above to collapse. *Id* at 7. However, the Donan consultant omitted this statement from all Donan reports, Hunter provided State Farm with the statements made by Donan. *Id.*

After State Farm denied Hunter's claim, Hunter filed suit for Unfair and Deceptive Trade Practices, among other causes of action. State Farm moved to dismiss Hunter's claim of Unfair and Deceptive Trade Practices for failure to state a claim. The Browder allegations pertinent to this matter are as follows:

> 80.    State Farm, in failing to pay Plaintiff's claims that were covered by the Policy, has engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices…;
> 83.    State Farm has violated N.C.G.S. § 58–63–15, by violating, at a minimum, the following provisions of § 58–63–15 (11) Unfair Claim Settlement Practices;

a. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

b. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

c. Refusing to pay claims without conducting a reasonable investigation based upon all available information;

d. Failing to affirm or deny coverage of claims within a reasonable time after proof-of-loss statements have been completed;

e. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

f. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled;

g. Failing to promptly settle claims where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; and

h. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

85.     Upon information and belief, State Farm has adopted a policy and practice in denying coverage involving an assertion of the "Collapse" portion of policy coverage in instances where a part of the building has caved in but the part of the house has not fallen down;

91.     …State Farm was put on actual notice of the statements of its agent, Donan, [that the opening of the basement door could result in a catastrophic failure of the wall above the door because the wall had virtually collapsed above it] by correspondence from Plaintiff's counsel on December 10, 2014, and March 13, 2016; and

95.     The denial of the Plaintiff's claim based on the continued reliance on the Donan opinions after receipt of correspondence from Plaintiff's counsel indicating that the Donan representative stated that that the opening of the basement door could result in a catastrophic

failure of the wall above the door constituted an unfair and deceptive
trade practice under North Carolina Law.

(*Hunte*r Complaint ¶¶ 80, 83, 85, 90-95).

*See* https://ecf.ncwd.uscourts.gov/doc1/13503481520

After review of Hunter's Complaint, the trial Judge denied State Farms
12(b)(6) motion. *Hunter v. State Farm Fire & Cas. Co*., 2018 U.S. Dist. LEXIS
127032, *12 (2018). In making the decision, the trial Judge found that Hunter's
Complaint set forth sufficient facts to establish a UDTPA claim, providing that
Hunter met her 12(b)(6) burden by alleging that State Farm ignored Donan's full
opinion or failed to consider Donan's full opinion without explanation. *Id* at 9, 10.

There are remarkable similarities between the allegations within the Hunter
Complaint and the allegations within the Amended Complaint. Plaintiffs' claims of
Bad Faith Settlement Practices and Unfair and Deceptive Trade Practices is
predominantly based around Defendant's refusal to consider their expert's opinions
without explanation as to why Plaintiffs' expert opinions were omitted from
Defendant's consideration. Similar to Hunter's allegations that State Farm ignored
Donan's statements pertaining to the homes structural integrity, the Amended
Complaint alleges in paragraph 81 that Defendant "solely reli[ed] on information
provided by [Defendant's] engineer and not equally considering the data provided
by Plaintiff[.]" JA306. The Amended Complaint even goes to further detail,
providing that: (1) Defendant's field adjuster conducted a visual inspection only and

did not perform a more invasive investigation; (2) Defendant failed to adhere to the North Carolina Department of Insurance recommendation; (3) Defendant purposefully undervalued of the loss because of their failure to perform an invasive investigation; (4) Defendant ignored Plaintiffs' notices of more extensive damages; and (5) Defendant placed their own interest above Plaintiffs' by representing that the extent of the damages was lower than what they knew it to be. JA296, JA303-304, JA309. Therefore, the Amended Complaint is sufficient to pass a 12(b)(6) test.

### C.  *Gandecha v. Metro. Prop. & Cas. Ins. Co*.

In *Gandecha v. Metro. Prop. & Cas. Ins. Co.,* Gandecha initiated a complaint (hereinafter referred to as the "Gandecha Complaint") against Metro. Prop. & Cas. Ins. Co. (hereinafter referred to as "Metro") after Metro failed to pay the full amount of Gandecha's claim, resulting from thunderstorm damage to Gandecha's home. *Gandecha v. Metro. Prop. & Cas. Ins. Co*., 2014 U.S. Dist. LEXIS 118823, *1 (2014). The claim was for wind and hail damage to the roof, gutters, windows, metal surfaces, as well as water damage to the interior of the home. *Id.* However, after Metro's inspector examined the property, he found no evidence of hail and/or wind damage and offered Gandecha no compensation. *Id* at 3. Gandecha disputed Metro's inspection and requested that the property be reevaluated, causing Metro to retain the services of Engineering Design & Testing Corp. (hereinafter referred to as "EDTC"). *Id.* EDTC found multiple instances of hail damage, but Metro seemingly

26

ignored this report and only offered to make minor repairs, specifically refusing to

replace the roof. *Id* at 4. Gandecha again disputed Metro's findings, but Metro again

refused coverage, thus leading Gandecha to bring their civil action. *Id.*

The claims brought by Gandecha include Unfair and Deceptive Trade

Practices and Breach of Covenant of Good Faith and Fair Dealing, among other

claims. *Id* at 5. In response, Metro brought a motion to dismiss all claims. *Id* at 2.

The Gandecha allegations pertinent to this matter are as follows:

> 14.    Upon information and belief, [Metro] and/or its adjuster
> conducted an inadequate and/or improper inspection of the Property,
> which was used in the first adjustment of the Claim. Upon information
> and belief, [Metro] used an unqualified person who conducted a
> substandard inspection of the Property, which failed to acknowledge,
> discover, recognize, and/or include the entirety of the Storm Damage
> in their findings and/or reports;
> 15.    Citing the information and estimates provided by their
> roofing contractor(s). [Gandecha] disputed the findings of [Metro] and
> requested their Property and the Storm Damage be evaluated again;
> 17.    Upon information and belief, EDTC found multiple
> instances of hail damage to [Gandecha's] Property and specifically to
> the Property's roof and metal surface;
> 18.    Despite the existence of significant evidence of hail and/or
> wind damage to the Property, [Metro] only offered to make minor
> repairs to the Property and refused to replace [Gandecha's] roof, even
> though the observed Storm Damage justified replacement[.];
> 20.    Upon information and belief, [Metro] continued to rely on
> incorrect adjustments and faulty information to again wrongfully deny
> complete coverage of [Gandecha's] Storm Damage;
> 21.    Among other things, [Metro's] adjustments, reports,
> pictures and accompanying documents failed to initially recognize the
> Storm Damage, failed to acknowledge the cause and extent of the Storm
> Damage, provided false or misleading information for the purposes of
> denying the Claim, was conducted by biased parties using non-industry

standard inspection methods to justify denying the Claim and did not allow adequate funds to cover repairs of the actual Storm Damage;

22.    Without limitation, [Metro] and/or its agents misrepresented the cause of, scope of, and cost to repair the Storm Damage, and/or the amount of insurance coverage available for the Claim under the Policy;

25.    [Metro] misrepresented to [Gandecha] that there was no Storm Damage or the Storm Damage was minimal and did not justify complete coverage under the Policy and/or did not constitute damage to the Property justifying coverage under the Policy. However, [Metro] and/or its agents' representations were false because the cost to repair the Storm Damage based on estimates obtained by [Gandecha] is approximately $26,845.31;

26.    [Metro] and/or its agents failed to properly adjust the Claim and [Metro] improperly denied the Claim without an adequate investigation, even though the Policy provided coverage for losses such as those suffered by [Gandecha];

29.    [Metro] and/or its agents misrepresented to [Gandecha], the existence of the Storm Damage, that the Storm Damage to the Property did not justify coverage under the Policy or was not covered under the Policy, even though the Storm Damage was caused by a covered occurrence or event…;

30.    [Metro] and/or its agents failed to make an attempt to settle the Claim in a fair manner, although they were aware of [Metro's] liability to [Gandecha] under the terms of the Policy…;

31.    [Metro] and/or its agents failed to offer an adequate explanation to [Gandecha] of the reasons for its denial of the claim. Specifically, [Metro] and/or its agents failed to offer [Gandecha] adequate compensation, without any explanation as to why full payment of the Claim was not required or being made…;

33.    [Metro] and/or its agents refused to compensate Gandecha for the Storm Damage, under the terms of the policy, even though [Metro] and/or its agents failed to conduct a reasonable investigation of the Property and the Claim. Specifically, [Metro] performed an outcome-oriented investigation of the Claim, which resulted in a biased, unfair, and inequitable evaluation of [Gandecha's] losses to the Property…;

34.    [Metro] failed to accept or deny [Gandecha's] Claim after receiving all necessary information to process the Claim…;

35.    [Metro] failed to meet its obligations under the terms of the Policy and/or North Carolina law regarding payment of the claim without delay. Specifically, [Metro] denied the Claim citing false or misleading information as the basis for said denial…;

45.    Upon information and belief, after the receipt of either actual or written notice of the Claim, [Metro] committed the following acts in violation of N.C. Gen. Stat. § 58-63-15 and N.C. Gen. Stat. § 75-1.1 et seq.:

> a.    Misrepresenting pertinent facts regarding the Storm Damage and/or Policy provisions related to coverage at issue in the Claim;
>
> b.    Using unqualified persons to evaluate claims such as [Gandecha] causing unreasonable delays by using said person for the adjustment of claims;
>
> c.    Refusing and/or failing to pay [Gandecha's] rightful Claim, which is by definition an unfair and deceptive trade practice…;
>
> d.    Failing or refusing to acknowledge the cause and extent of the Storm Damage;
>
> e.    Failing to conduct an adequate and proper inspection of the Property to allow for prompt and accurate settlement of the Claim;
>
> f.    Failing to request any items, statements, and/or forms from [Gandecha] that it reasonably believed at that time would be required for their Claim;
>
> g.    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under [Metro's] insurance policies;
>
> h.    Failing to affirm or deny coverage of claims within a reasonable amount of time;
>
> i.    Not attempting in good faith to effectuate prompt, fair, and equitable settlements of the Claim, in which liability has become reasonably clear;
>
> j.    Compelling the insured to institute litigation to recover amounts due under the Policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured;
>
> k.    Attempting to settle the Claim for far less than the amount to which a reasonable man would have believed he was entitled.

(*Gandecha* Complaint ¶¶ 13-15, 17, 18, 20-22, 25, 26, 29-31, 33-35, 45).

*See* https://ecf.nced.uscourts.gov/doc1/13103546849

Ultimately, the court denied Metro's motion to dismiss Gandecha's claim for UDPTA and Breach of Covenant of Good Faith and Fair Dealing.

There are several similarities between the Gandecha Complaint and the Amended Complaint. Similar to the Gandecha Complaint, the Amended Complaint alleges that Plaintiffs provided an expert report to Defendant evidencing damage to Plaintiffs' property covered under the Policy, but Defendants ignored the report. Similarly, both the Gandecha Complaint and Amended Complaint allege that the defendants performed and relied on an inadequate inspection, despite the reports. Additionally, both complaints allege that the respective insurance companies failed to adequately explain their reasons for denial. The Amended Complaint even goes as far as to detail that Defendant's Adjuster's loyalty was divided and that Defendants ignored the industry standard for ocean properties. Therefore, like Gandecha's Complaint, the Amended Complaint is sufficient to pass a 12(b)(6) test.

## CONCLUSION

The district court's order dismissing Plaintiffs' Amended Complaint in this case is contrary to the well-established case law. This Court should therefore reverse the judgment of the district court and remand the case for further proceedings.

Respectfully submitted,

*/s/  Wesley A. Collins*
Wesley A. Collins
HARVELL &COLLINS
1107 Bridges Street
Morehead City, NC 28557
(252) 726-9050
input@harvellandcollins.com

*Counsel for Appellants*

31

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with type-volume limits because, excluding parts exempted by Fed. R. App. P.32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This document contains <u>7,819 words</u>.

2.     This document complies with the type-face requirements because: This document has been prepared in proportional spaced typeface using <u>Microsoft Word and 14-point Times New Roman</u>.

*/s/  Wesley A. Collins*
Wesley A. Collins
HARVELL &COLLINS
1107 Bridges Street
Morehead City, NC 28557
(252) 726-9050
input@harvellandcollins.com

*Counsel for Appellants*
